**FIRST SECURITY BANK OF UTAH, N.A., et al.**

v.

**NORTHWEST AIRLINES, INC.**

No. Civ.A. 95–12103–RGS.

United States District Court,
D. Massachusetts.

April 15, 1999.

Beth O'Neill Maloney, Peabody & Brown, Boston, MA, for Plaintiffs.

John C. Bartenstein, Peter L. Ebb, Ropes & Gray, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON THE PARTIES' CROSS–MOTION FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

On June 29, 1998, Magistrate Judge Karol issued an exhaustive fifty-six page Report, recommending that plaintiffs be granted summary disposition on Count IV of the Third Amended Complaint (seeking a declaration of the rights of the parties). Defendant Northwest Airlines objected. After further briefing, a hearing was held on January 28, 1999. After careful study of the Report, the disputed Lease,[1] and the pleadings, I will adopt the substance of the Magistrate Judge's Recommendation. While I do not necessarily agree with every nuance of the Magistrate Judge's interpretation of the Lease, his ultimate conclusion achieves an equitable result that is consistent with a common sense deduction of the parties' reasonable expectations on entering the Lease. The Magistrate Judge's overall construction of the Lease gives neither party an undue advantage at the other's expense. Under the Magistrate Judge's analysis, plaintiffs were entitled to "get back the original Engines, maintained in accordance with the Lease or their equivalents [i.e., Replacement Engines]—nothing less, but nothing more either." Report, at 35.[2]

I agree with the Magistrate Judge that his interpretation restores symmetry to the leases by placing the return of the Engines on the same footing as the return of the Airframes. Report, at 35, 43. I further agree with his conclusion that section 7.2.2 of the Lease "prohibited[ed] Northwest from doing just what it did here," Report, at 16, particularly when section 7.2.2 is read in conjunction with its parent, section 7.2, which prohibited Northwest from discrimination in its maintenance of the Lessor's aircraft.[3] (I read more significance into section 7.2 than perhaps did the Magistrate Judge, al-

1. There are in fact three Leases, but because they are virtually identical in wording, I will refer to them in the singular.

2. The capitalization (or non-capitalization) of words like "Engine" and "parts," follows the usage of the Lease.

3. Northwest argues that the maintenance and Parts replacement provisions of the Lease ap-

ply only to Engines, and that it was free to "discriminate" against engines that it owned prior to their becoming Replacement Engines attached to the Lessor's Airframes. While in a hypertechnical sense this is true, Northwest's reading ignores the evident purpose of these provisions. As plaintiffs explain, their goal in negotiating the nondiscrimination and Parts replacements provisions was not to

though the difference in emphasis does not detract from his ultimate conclusion). And, I agree with the Magistrate Judge that Northwest's selective deconstruction of the terms of the Lease, while not implausible as a parsing exercise, leads to so peculiar a result ("permit[ting] Northwest to do indirectly what the Lease indisputably prohibits it from doing directly," as the Magistrate Judge phrased it) that it is impossible to believe that it could accurately reflect the outcome of arms-length negotiations between parties of essentially equal bargaining power.[4]

Northwest's objections at their core focus on section 8.6 of the Lease to the exclusion of all others. Section 8.6 established a floor below which the number of remaining hours and cycles of operation on an Engine's disks could not fall. Because the Replacement Engines returned by Northwest indisputably met this minimum standard, Northwest argues that it is enti-

tled to summary judgment. The Magistrate Judge disagreed, pointing out that Northwest's myopic focus on section 8.6 rendered a number of other provisions of the Lease (notably section 7.2.2) essentially meaningless. He also adopted the Lessor's argument that section 8.6 merely "establishes a floor below which the Hours and Cycles remaining on the returned Engines must not under any circumstances fall, but that it does not supercede any general provision dealing with maintenance or Parts replacement." Report, at 23. See also id., at 41 n. 8. This interpretation is sensible, as it addresses the not implausible possibility that Northwest, for economic or other reasons, might lower, over the term of the Lease, maintenance standards in its fleet to the minimum levels required by federal regulation.

Northwest's repeated refrain is that under the Magistrate Judge's "fixture" analysis,[5] it is the victim of its own good deeds.

---

force Northwest into upgrading the leased aircraft, but simply "to ensure the return of Engines, Replacement or otherwise, which reflected Northwest's fleet, on average across the nine … engines Northwest would return to Plaintiffs." Plaintiffs' Response, at 16. Plaintiffs' position, in other words, does not ignore, as Northwest claims, its "wear and tear" argument. Plaintiffs simply seek to share any such "wear and tear" on a pro rata basis with Northwest's own fleet, rather than permitting Northwest to shift a disproportionate share of that "wear and tear" to their planes (which in effect is what Northwest has done).

4.  Northwest concedes that the Lease clearly prohibited it from replacing the Parts of an Engine with inferior Parts, but argues that because a complete engine or Engine is defined by the Lease not to be a Part, it had the option of building down an engine to the minimum specifications of section 8.6 of the Lease and attaching it as a Replacement Engine before returning the Airframe to the Lessor. See Report, at 12–13. As the Magistrate Judge pointed out: "I can think of no reason, and Northwest has suggested none, why the parties would have intended to prohibit Northwest from returning the original Engine with replaced [down-graded] disks but not an otherwise identical Replacement Engine." Report, at 41. The best that Northwest can say in response is that "[t]here is, of course,

no principle of contract construction that an election of remedies, return options, or other alternatives provided to a contracting party, must always produce an identical result." Defendant's Objections, at 18 n. 12. While the results need not always be identical, there is some utility in their being fair and reasonable.

5.  This is a reference to the Magistrate Judge's "alternative" interpretation of the section 7.2.2: "[A]t the time an engine replaces an original Engine pursuant to Section 8.2, all Parts of such engine (now a Replacement Engine) become 'replacement Parts' with respect to the original Engine (now an engine), within the meaning of Section 7.2.2. As such, all such replacement Parts (including, but not limited to, disks) must 'be in as good operating condition as, and shall have a value and utility at least equal to' the corresponding Parts (now parts) of the replaced Engine (now an engine) as of the instant of replacement." Report, at 33. Although the interpretation advocated by the Magistrate Judge is admittedly difficult to grasp (principally because it is written using the peculiar lexicography of the Lease itself), it becomes clearer when one considers that under the terms of the Lease, Northwest had the option of returning the original Engines in their then existing condition so long as they had been maintained in accordance with the terms of the Lease. Re-

"[I]f Northwest, never expecting to return the original Engines, happened to have installed on them disks having remaining hours and cycles significantly in excess of the requirements of either ordinary wear and tear or Section 8.6, Northwest would be obliged to forfeit that additional value to the lessors." Defendant's Objections, at 26–27. This complaint ignores the fact that, under the Magistrate Judge's construction of the Lease, Northwest was permitted to build down a Replacement Engine that in the normal course of maintenance had acquired Parts superior to those that had come to be contained in an original Engine that it was then replacing. Report, at 34, 53.. By requiring defendant to return Replacement Engines at least comparable in value and utility to the original Engines as of the time the Lessor transferred title to the original Engines to Northwest, and nothing more, the Magistrate Judge was careful to insure that the Lessor would receive no undue windfall. Assuming that Northwest complied with the nondiscrimination provisions of the Lease in maintaining the original Engines, the law of averages works to protect Northwest's interests. Given its own description of the manner in which disks are replaced (on a parts available basis, whether new or used) some of the original Engines will have received superior Parts (disks), others Parts less valuable.

In its fundamentals, this dispute stems from a concept (an engine is not an Engine is not a Part) that was written into the Lease as a valuable accommodation to Northwest (permitting it to cycle the Engines in regular course through its fleet and relieving it of the burden of locating and reattaching the original Engines before returning the Airframes to the Lessor). Report, at 43. Northwest should not now be permitted to twist this concept, from which it derived a significant benefit, so as to extract from the Lessor an addi-

port, at 35. If Northwest were to elect (as it largely did) to return Replacement Engines in lieu of the originals, the Lessor, under the Magistrate Judge's interpretation of the

tional advantage never contemplated by the contracting parties.

## ORDER

For the foregoing reason, the Magistrate Judge's Recommendation is *ADOPTED* as to Count IV of the Third Amended Complaint. Plaintiffs' request for further discovery, as set out in footnote 11 of their Response, is also *ALLOWED*. Defendant will produce the requested discovery within thirty (30) days of this *ORDER*.

## *REPORT AND RECOMMENDATION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCKET NOS. 52 AND 60)*

KAROL, United States Magistrate Judge.

This case is about the meaning of three substantially identical lease agreements, each lease being for a single commercial aircraft leased by one of three trusts to defendant, Northwest Airlines, Inc. ("Northwest"). The specific question is whether Northwest, upon its return of the aircraft at the end of the lease term, had the right to remove relatively valuable parts from the engines of the aircraft and substitute less valuable parts for them. The answer turns entirely on how the leases are interpreted, there being no dispute about the fact that removal and substitution occurred. Each side has moved for summary judgment on the issue of lease interpretation, claiming that the leases are unambiguous but that, even if they contain a material ambiguity, the ambiguity can be resolved only one way on the basis of undisputed extrinsic evidence. For reasons set forth below, I conclude that the leases, though exceptionally complex, are indeed unambiguous with respect to the matter in dispute, and that, with certain

Lease, is entitled to receive substitute Engines of equivalent value and utility, but "nothing more either." Id.

modifications, the plaintiffs' interpretation is the correct one. Accordingly, subject to those modifications and without consideration of the proffered extrinsic evidence, I recommend that summary judgment on the issue of interpretation be granted to plaintiffs.

## I. BACKGROUND AND PRIOR PROCEEDINGS

Plaintiffs are First Security Bank, N.A. ("FSB") and Investors Asset Holding Corp. ("IAHC"), in their respective capacities as trustees of three separate trusts. Each trust entered into an Aircraft Lease Agreement with Northwest in December 1989 for a different Boeing 727–200 Advanced Series jetliner equipped with three Pratt & Whitney Model JT8D–15 engines. The three Aircraft Lease Agreements (collectively, the "Leases" or, individually, a "Lease") are identical in all respects material to the present dispute. FSB is trustee of two of those trusts, designated as the AFG/Northwest Airlines 1989–3 Trust and the AFG/Northwest Airlines 1989–4 Trust; IAHC is trustee of the third, designated as AFG/Northwest Airlines 1989–2 Trust. Since there are no material differences among the Leases, all further references will be to the Lease between IAHC and Northwest, a true and accurate copy of which was marked as Deposition Exhibit 26 (Docket No. 78) and submitted for consideration by the court in connection with the pending cross motions for summary judgment.

The Lease is a well-drafted but formidable document that only a lawyer or an insomniac could love. It consists of twenty-five sections and scores of subsections that fill seventy-five densely written, single-spaced pages (plus supplements and exhibits) that are bursting with cross references, provisos, and defined terms. Three of the sections are particularly germane: Section 1, which sets forth definitions for dozens of terms, several of which are pertinent to the present dispute; Section 7, which deals, among other things,

with aircraft maintenance requirements and parts replacement; and Section 8, which is aptly titled "Return of the Aircraft." The dispute, in a nutshell, is this: did Northwest violate the Lease by stripping engines of valuable parts and replacing them with less valuable parts just before it returned the aircraft at the end of each Lease term in the fall of 1995? That such stripping occurred is not disputed; whether the Leases permitted it very much is.

The particular engine part around which the controversy swirls is a rotating object called a "disk" (although plaintiffs do not waive their right to claim that Northwest also removed other valuable engine parts and replaced them with less valuable counterparts). Each JT8D–15 engine contains 17 such disks; collectively, these 17 disks comprise a substantial portion of the value of the engine. Each disk has a limited useful life, and disk life is carefully regulated and monitored. As explained by Northwest in its Memorandum in Support of Its Motion for Summary Judgment ("Northwest's Mem. in Support"), at 6–7 (Docket No. 54):

> The disks contained in a JT8D–15 engine are subject to mandatory "life limits," assigned by the manufacturer, that are expressed in terms of both a maximum number of flight "hours" and a maximum number of "cycles" (each "cycle" consisting of one takeoff and landing) .... The life limits established by the manufacturer, in turn, are incorporated into Northwest's FAA-approved Maintenance Program (defined in the Leases as the "Maintenance Program") .... When any disk in an engine reaches the end of its permitted life, the engine may no longer be flown, under FAA regulations, until that disk has been replaced.... Because the disk with the least number of "hours" and "cycles" remaining effectively limits the permissible time of operation of the engine before it must be removed for overhaul,

that disk is commonly referred to as the "limiter."

In the summer of 1995, as the Leases were approaching expiration, the parties met and discussed, among other things, the condition of the engines that Northwest would be returning. As explained below, it is undisputed that Northwest was not required to return the same engines that it had received at Lease inception; rather, subject to various constraints, some of which are at issue here, Northwest had the right to return other engines of the same type. When the discussion turned to the condition of the disks of the engines to be returned, Northwest made no secret of the fact that it intended to replace at least some of the disks of those engines with other disks that were closer to the limits of their useful life, but which Northwest insisted would still meet all requirements of the Leases. Each party uses its own euphemism to describe the engines that Northwest intended to (and actually did) return: Northwest describes those engines as having been "freshly built;" plaintiffs describe them as having been "built down." In either case, the parties sharply disagreed about whether Northwest had the right under the Leases to "rebuild" the engines to substitute shorter life disks for longer life ones. Notwithstanding such disagreement, Northwest in fact returned engines in the fall of 1995 which had been rebuilt in the manner it had described, and plaintiffs accepted the return of those engines, under a reservation of rights. This litigation quickly ensued.

The operative complaint is the Third Amended Complaint (Docket No. 44), which sets forth seven counts. Counts I, II, and III, respectively, are for breach of contract with respect to each of the three Leases. Count IV, for declaratory judgment, seeks a declaration that Northwest's practice of substituting shorter life disks for longer life disks in the returned engines violated the Leases. Counts V, VI, and VII, which allege essentially the same conduct, are for breach of Massachusetts General Laws ch. 93A ("Chapter 93A"), breach of the implied covenant of good faith and fair dealing, and conversion, respectively.

At a Rule 16 Scheduling Conference in January 1996, the court bifurcated the case into two phases: Phase I, dealing with the issue of Lease interpretation, and Phase II, if necessary, dealing with damages. Following some initial skirmishing, including the denial by the court of Northwest's motion for judgment on the pleadings on plaintiffs' claim for violation of Chapter 93A, the parties proceeded with, and completed, Phase I discovery. Each party then moved for summary judgment on the issue of whether the Leases, properly interpreted, permitted Northwest to do what it did. (*See* Northwest's Motion for Summary Judgment, Docket No. 52; Plaintiff's Cross–Motion for Summary Judgment, Docket No. 60.) In October 1997, I heard oral argument on the parties' cross motions and, at that time, inquired about a possible variation of plaintiffs' interpretation that neither side had proposed. Under that alternative interpretation, Northwest may or may not have been permitted to do what it did, depending on the existence of certain circumstances that could not be determined on the basis of the present record. At the conclusion of the hearing, I invited the parties to submit supplemental memoranda addressing two related issues: whether the alternative explanation was at least plausible, and whether the parties continued to believe, as they had maintained in their pre-hearing memoranda, that the issue of interpretation involved a pure question of law. (Transcript of Hrg. on Oct. 27, 1997 at 76–80, Docket No. 73.)

Supplemental briefing was completed in January 1998. (*See* Northwest's Supplemental Memorandum Addressing Question Posed By Magistrate Judge ("Northwest's Supp.Mem."), Docket No. 76; Plaintiff's

Supplemental Memorandum in Support of Cross–Motion for Summary Judgment ("Pl.'s Supp.Mem."), Docket No. 77.) Both sides continued to maintain that the Leases were unambiguous (in their respective favor) and should be interpreted as a matter of law, but that, even if they were ambiguous, they should still be interpreted in their respective favor as a matter of law because the material extrinsic evidence was also undisputed and supported only one conclusion. (Northwest's Supp.Mem. at 3–4, Docket No. 76; Pl.'s Supp.Mem at 6–7, Docket No. 77.) Regarding the alternative interpretation on which I had invited supplemental briefing, Northwest's unequivocal position was that such interpretation was implausible and inconsistent with the plain language of the Leases. (Northwest's Supp.Mem. at 2–3, Docket No. 76.) Plaintiffs, on the other hand, while continuing to maintain that their original interpretation was the proper one, took the position that the alternative interpretation about which I had invited comment was plausible and, in most respects, "consistent" with theirs, so much so that they did not oppose and were prepared to accept it. (Pl.'s Supp.Mem at 1, 5, Docket No. 77.) Upon consideration of the supplemental memoranda, the arguments of counsel, and the entire summary judgment record, and for reasons set forth below, I have concluded that the Leases, taken as a whole and without resort to extrinsic evidence, can fairly be read only in accordance with the alternative that was first discussed at the October 1997 hearing. I therefore recommend that partial summary judgment be granted to plaintiffs in accordance with such interpretation, leaving for another day the unresolved factual question whether, under such interpretation, there was a breach of the Leases by Northwest and, if so, the amount of damages, if any, to which plaintiffs are entitled.

## II. *THE LEASES*

### A. *Overview*

As noted, each Lease deals with a single Boeing 727–200 Advanced Series jetliner equipped with three Pratt & Whitney Model JT8D–15 engines, for which combination there is set forth in a supplement to each Lease a single, comprehensive monthly rental rate. Significantly, however, the Lease permits Northwest to remove the three leased engines from the leased airframe to which they are initially attached, to attach the leased engines to airframes other than the leased airframe, and to attach to the leased airframe engines other than the leased engines, all without affecting the manner in which the Lease applies to the leased engines. In this respect, the Lease follows the engines. In fact, it is helpful to an overall understanding of the Lease to conceptualize it for most purposes as governing the lease of a specific airframe and, as a distinct matter, the lease of three specific engines (wherever within the Northwest fleet those three engines may from time to time be located), which engines happen to be physically attached to the airframe at Lease inception but need never be attached to it again. With one exception material to the present dispute, the provisions that govern the airframe and that govern the engines mirror each other. The exception is that, barring extraordinary circumstances, Northwest was expected to return at the end of the Lease term the same airframe that it had received at the beginning, but it was not expected to return the same engines. This significant difference in treatment is attributed by both sides, with varying degrees of emphasis, to the fact that it is industry practice for large air carriers such as Northwest routinely to remove engines from airframes for periodic maintenance, which can take several months, and to replace them with whatever engines happen to be coming out of the maintenance shop. The need for the Lease to accommodate this industry practice of rotating engines through the carrier's fleet to minimize aircraft downtime is what ultimately gives rise to the question presented here about the quality standards

that the returned engines must meet. To begin the process of answering that question, I will now set forth the Lease provisions that appear to have the most direct bearing on the issue, followed by comments that attempt to explain the significance of the highlighted provisions.

### B. *Review of Specific Lease Provisions*

SECTION 1.  Definitions

The term **"Aircraft"** is defined to mean, in pertinent part, "(i) the Airframe identified and described in the Lease Supplement ... to be delivered and leased hereunder (or any airframe from time to time substituted for such Airframe pursuant to the terms hereof)" and "(ii) the three Engines initially leased hereunder (or any engine substituted for any of such Engines pursuant to the terms hereof), whether or not any of such initial or substituted Engines may from time to time be installed on such initial or substituted Airframe or may be installed on any other airframe or on any other aircraft." (Lease at I, Docket No. 78.)

*Comment:* It is important to note that the "Engines initially leased hereunder or any engine substituted for any of such Engines pursuant to the terms [of the Lease]," (*id.*), continue to be included within the definition of "Aircraft" (and therefore to be the property of the Lessor and subject to the Lease), even though they may have been removed from the Airframe. This much is undisputed. There is a dispute, however, about the meaning of the word "substituted," or, more precisely, about the point at which an engine becomes "substituted" for an Engine. Plaintiffs contend that the substitution of an engine for an Engine occurs as early as the point at which Northwest is aware that a particular engine is going to be attached to the Airframe in place of an Engine. Northwest contends, correctly in my opinion, that the phrase "pursuant to the terms hereof" means that substitution does not take place until Northwest formally conveys to the Lessor title to the substitute

engine and the Lessor, in return, conveys title to the original Engine to Northwest, all through a formal exchange of title documents. This usually occurs, if at all, at the end of the Lease term pursuant to Section 8.2 (discussed below), but it can also occur under other circumstances, such as pursuant to Section 10.2 (Event of Loss with Respect to an Engine) or 10.5 (Requisition for Use of an Engine by the United States Government, etc.), both of which are also discussed below. In this manner, three Engines, and only three Engines, are always subject to the Lease at any given time.

The term **"Airframe"** is defined to mean, in pertinent part, "(i) the Aircraft (except Engines or engines from time to time installed thereon) [or any permitted substitute therefor] ... and (ii) any and all Parts (except Parts which are incorporated or installed in or attached to an Engine) ... provided, however, that at such time as an aircraft (except Engines or engines from time to time installed thereon) shall be deemed part of the property leased hereunder in substitution for the Airframe pursuant to the applicable provisions hereof, the replaced Airframe shall cease to be an Airframe hereunder." (*Id.* at 1–2.)

*Comment:* This definition introduces two important concepts. First, it demonstrates the distinction the Lease makes between an Airframe and Engines. Together, the two comprise the Aircraft, for which the Lease charges a single, monthly rental. For most other purposes, however, the Lease treats an Airframe and Engines as separately leased (but similarly treated) components. Second, it presents an important concept that will later be made applicable to Engines as well. At any given time, only a single, specifically identified Airframe can and must be subject to the Lease (just as three specifically identified Engines can and must at all times be subject to the Lease). This is accomplished by the provision that causes the initial Airframe to "cease to be an Airframe hereunder" as soon as another

airframe is for any reason substituted for the initial Airframe. (*Id.* at 2.)

The term **"Cycle"** is defined to mean "one takeoff and landing of the Aircraft." (*Id.* at 3.)

*Comment:* The dispute, in part, is whether Northwest had the right to substitute disks with a relatively low number of Cycles remaining for disks with a relatively high number of Cycles remaining in the engines it rebuilt and returned at the end of the Lease term in place of the original Engines.

The term **"Engine"** is defined to mean, in pertinent part, "(i) each of the engines listed by manufacturer's model and serial number in the Lease Supplement and installed on the Airframe . . . on the Delivery Date, whether or not from time to time thereafter installed on the Airframe or installed on any other airframe or on any other aircraft; [and] (ii) any engine which may from time to time be substituted, pursuant to the terms hereof, for any of such three engines . . . provided, however, that at such time as an engine shall be deemed part of the property leased hereunder in substitution for an Engine pursuant to the applicable provisions hereof, the replaced Engine shall cease to be an Engine hereunder." (*Id.* at 4.)

*Comment:* This definition is the counterpart to the definition of "Airframe" and is what causes the Lease to follow the Engines. Thus, it defines "Engine" initially to mean the three specific engines delivered at Lease inception, wherever within Northwest's fleet they may happen to be located from time to time; it extends the definition to engines "which may from time to time be substituted, pursuant to the terms hereof," (*Id.*), for any of those original Engines; and, to assure that only three Engines are subject to the Lease at any given time, it excludes from the definition of "Engine" any former Engine for which another Engine has been substituted "pursuant to the applicable provisions" (*id.*), of the Lease. The Lease does not define the word "substituted," and, as noted above, the parties disagree about the point at which substitution occurs.

The term **"Maintenance Program"** is defined to mean, in pertinent part, "the Lessee's FAA-approved maintenance program for aircraft of the same type as the Aircraft and engines of the same type as the Engines as in effect from time to time." (*Id.* at 6.)

*Comment:* Lessors contend that the replacement of disks under the circumstances involved here constitutes an impermissible deviation from Northwest's Maintenance Program. Northwest contends that the Maintenance Program has no applicability whatsoever to disk replacement under the circumstances involved here.

The term **"Parts"** is defined to mean, in pertinent part, "all appliances, parts, instruments, appurtenances, accessories, furnishing and other equipment of whatever nature (other than . . . complete Engines or engines . . .) which may from time to time be incorporated or installed in or attached to the Airframe or any Engine or so long as title thereto shall remain vested in Lessor in accordance with Section 7 after removal therefrom." (*Id.* at 7.)

*Comment:* This is a critical definition. All the parts of an Airframe are Parts and all the Parts of an Engine are Parts, but neither complete Engines nor complete engines are themselves Parts. For example, a tire or a seat is a Part, because it is incorporated or installed in or attached to the Airframe, and an Engine disk is also a Part, because it is incorporated or installed in or attached to the Engine. But the leased Engines themselves are not Parts; nor are other engines that Northwest may happen to own outright. This is important because, as we shall soon see, the Lease permits Northwest to replace Parts (such as tires, seats, and Engine disks), provided it replaces them with Parts of equal value and utility. Under this definition, therefore, Northwest is not permitted to remove from an Engine a disk with X Cycles or

Hours remaining and replace it with a disk with only .5X Cycles or Hours remaining, because the replacement disk, a Part of an Engine, would be less valuable than the disk that it replaced. This much is undisputed. Northwest contends, nevertheless, that since a complete Engine or engine is not itself a Part, the Lease permits Northwest, at the end of the Lease term, to replace a complete Engine whose disks have X Cycles or Hours remaining with a less valuable engine whose disks have only .5X Cycles or Hours remaining, if it happens to own such a complete engine outright and have it available for such purpose. Further, it contends that since an engine does not become an Engine until it has been substituted for an Engine in accordance with the terms of the Lease, the parts of such engines do not become Parts until the engine in which they are installed is substituted for the Engine in accordance with the terms of the Lease. Putting all this together, Northwest contends that even if it does not happen to have available an engine with short disk life remaining as the Lease approaches expiration, it may create such an engine by removing longer life disks from any engine that it happens to own outright and replacing them with shorter life disks (because engines are not Engines and parts of such engines are therefore not Parts). In addition, once it has made such replacement, it may substitute such rebuilt engine for the more valuable original Engine containing the longer life disks. Since complete Engines and complete engines are not Parts, this swap, according to Northwest, does not run afoul of the Lease provision that requires it to replace each removed Part with a Part of comparable value and utility. In accordance with this interpretation of the Lease, Northwest in fact rebuilt engines and made such swaps in just this manner immediately before it returned the Aircraft in the fall of 1995, thus doing indirectly what the Lease would clearly prohibit it from doing directly.

Deferring for the moment the question whether complete Engines and engines were excluded from the definition of Parts for the specific purpose of permitting the swapping of relatively low-value, rebuilt engines for relatively high-value Engines, a little reflection reveals a plausible alternative explanation for the exclusion of complete Engines and engines from the definition of Parts. If complete Engines were Parts, then each time an Engine were removed from an Airframe for routine maintenance the Engine, being a Part (*i.e.,* a piece of equipment attached to the Airframe), would immediately have to be replaced by another Engine, which new Engine would then immediately become the property of the Lessor and subject to the Lease in place of the original Engine, and which original Engine, in turn, would simultaneously become the property of Northwest and cease to be an Engine. This would be fundamentally inconsistent with the underlying concept of the Lease, which, as noted, was to have the Lease follow the Engines as they traveled through Northwest's fleet. None of this is to say that, for this reason alone, Northwest's interpretation of the Lease must be rejected. It is only to say that there is a simple alternative explanation for excluding complete Engines and engines from the definition of Parts, the existence of which undercuts any suggestion that there could have been no other reason for the parties to define Parts the way they did except to permit Northwest to do what it did.

SECTION 7. Registration, Maintenance and Operation; Possession and Subleases; Insignia.

Moving from the Definitions section of the Lease to the substantive provisions, Section 7.2, entitled "Maintenance," provides, in pertinent part, that Northwest, as the Lessee, shall "maintain, service, repair, and overhaul ... the Aircraft in accordance with the Maintenance Program so as to keep the Aircraft in as good operating condition as when acquired by Lessor ordi-

nary wear and tear excepted ... utilizing ... the same manner of maintenance, service, repair or overhaul used by Lessee with respect to similar aircraft owned or operated by Lessee." (*Id.* at 17.)

*Comment:* This is the so-called "anti-discrimination" provision and is one of the provisions on which plaintiffs rely most heavily for their argument that the Lease prohibited Northwest from swapping shorter life disks for longer life disks in engines that were to be used as replacements for Engines at the end of the Lease term. Plaintiffs' argument, in essence, is that removing and replacing disks is a form of Aircraft maintenance and, moreover, it is a prohibited form of Aircraft maintenance, since Northwest would never replace longer life disks with shorter life disks in engines that it owned outright and expected to retain in its fleet. Northwest's primary response is straightforward but, as we shall see in the context of Section 8.3 (discussed below), of doubtful validity. Northwest says simply that, even though this provision applies to Engines (since Engines are included within the definition of Aircraft), it has no application whatsoever to engines which, at the time the maintenance is taking place, Northwest owns outright and have not yet become Engines (and are therefore not yet included within the definition of Aircraft). Therefore, according to Northwest, this so-called anti-discrimination provision surely does not prevent it from removing disks from engines that it owns outright and are not subject to the Lease, replacing the removed disks with less valuable ones, and then using the rebuilt engines to replace Engines at the end of the Lease term.

Section 7.2.2, entitled "Replacement of Parts," provides, in pertinent part, that Northwest, as Lessee, "at its own cost and expense, will promptly replace ... all Parts which may from time to time be incorporated or installed in or attached to the Airframe or any Engine and which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated,

damaged beyond repair or permanently rendered unfit for use for any reason whatsoever.... In addition, Lessee ... may, at its own cost and expense, remove in the ordinary course of maintenance, service, repair, overhaul or testing, any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, provided that Lessee ... will at its own cost. and expense replace such Parts as promptly as practicable. All replacement Parts shall ... be in as good operating condition as, and shall have a value and utility at least equal to, the Parts replaced.... All Parts at any time removed from the Airframe or any Engine shall remain the property of Lessor, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to the Airframe or such Engine and will meet the requirements for replacement parts specified above. Immediately upon any replacement part becoming incorporated or installed in or attached to the Airframe or any Engine as above provided, without further act ... (i) title to such replacement Part shall thereupon vest in Lessor, (ii) such replacement Part shall become subject to this Lease and be deemed part of the Airframe or such Engine for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to the Airframe or such Engine, and (iii) title to the replaced Part shall thereupon vest in Lessee." (*Id.* at 21–22.)

*Comment:* This is another critical provision. It is this provision which, at a minimum, prohibited Northwest from doing directly (removing high-value disks from Engines and replacing them with disks of lesser value) what it did indirectly (replacing high-value Engines with engines of lesser value, rebuilt specially for such purpose). Depending on how certain of its terms are interpreted, it may also prohibit

Northwest from doing just what it did here.[1]

There are other respects in which this provision has significance, not the least of which is its implication for Northwest's argument, considered further below, that plaintiffs would receive a "windfall" if Northwest were not permitted to replace high value disks with low value disks in engines slated for use as replacements for Engines at the end of the Lease term. This provision clearly makes the Lessor the owner of all replacement Parts, notwithstanding that it imposes on Northwest the obligation to replace all worn out, lost, stolen, destroyed, damaged, or otherwise unfit Parts at Northwest's own expense. For example, if seat fabric happened to wear out four years and six months into the five-year term of the lease, Northwest would be obligated to replace the fabric at its own expense, but the replacement fabric would become the property of the Lessor immediately upon installation. Moreover, though it would hardly have been used and would have been paid for by Northwest, the new seat fabric would remain the property of the Lessor when the Lease term ended six months later. The same would be true with respect to any of the countless other Parts of the Airframe or Engines that could be expected to wear out or otherwise need replacement sometime during the term of the Lease, including Engine disks. Northwest may characterize this provision as a "windfall" for the Lessor, but use of that term does not change the fact that Parts routinely wear out and need to be replaced and that one party or the other must necessarily obtain the benefit of whatever useful life remains in the replacement Part at the end of the Lease term. This provision makes clear that such benefit belongs to the Lessor, regardless of the value of the replacement Part and notwithstanding that it is North-

west that must replace all worn out Parts at its own expense.

Section 7.2.4, entitled "Alterations, Modifications and Additions," provides, in pertinent part, that Northwest, as Lessee, "at its own expense, may ... make such alterations and modification in and additions to the Airframe or any Engine as Lessee ... may deem desirable in the proper conduct of its business, including, without limitation, removal of Parts which Lessee ... deems obsolete or no longer suitable or appropriate for use on the Airframe or such Engine (such parts being herein referred to as 'Obsolete Parts'); provided that no such alteration, modification or addition shall diminish the Fair Market Sales Value or utility of the Airframe or such Engine ... below the value [or] utility ... thereof immediately prior to such alteration, modification or addition ... except that the value ... of the Airframe or any Engine may be reduced by the value of Obsolete Parts which shall have been removed so long as the aggregate original cost of all Obsolete Parts which shall have been removed and not replaced shall not exceed $40,000." (*Id.* at 23.)

*Comment:* This provision is not as directly relevant to the dispute as the others previously discussed, in the sense that the outcome does not turn on the interpretation of any of its terms. Nevertheless it is important in the sense that it is one of several provisions that, in whole or in part, would be rendered all but meaningless if Northwest's interpretation of the Lease were adopted. Under Northwest's interpretation of the Lease, engines, as distinguished from Engines, are not at all subject to the Lease. Therefore, under such interpretation, Northwest can scrupulously comply with what was obviously a carefully considered limitation of $40,000 on the original cost of Obsolete Parts that it may remove from an Engine, while at the same

---

1. This is also the provision that would have caused a transfer of title and Lease coverage to occur each time an Engine was removed from an Airframe for maintenance and re-

placed by another engine, if the drafters had not had the foresight to carve out complete Engines and engines from the definition of Parts.

time removing and retaining unlimited quantities of obsolete parts from a shadow engine it knows it is going to return to the Lessor at the end of the Lease in lieu of the Engine. One may legitimately ask of what conceivable benefit the $40,000 limitation would be to the Lessor if, as interpreted by Northwest, it restricted Northwest's right to remove and retain parts from Engines that were to remain in Northwest's own fleet at the end of the Lease term but not from the ones that were to be returned to the Lessor. Of course, the same question may be raised regarding Section 7.2.2, if the Lease is construed to permit Northwest, having scrupulously complied throughout the Lease term with the requirement that it replace all Engine Parts with Parts of equal value and utility, to retain at the end of the Lease term the Engine whose value and utility it so meticulously preserved and to return in its place a less valuable engine it deliberately rebuilt with parts of lesser value and utility than the corresponding Parts of the retained Engine.

SECTION 8. Return of the Aircraft

The provisions of Section 8 apply "only to the return of the Aircraft." (Lease at 30, Docket No. 78.) Section 8.2, entitled "Return of Other Engines," provides, in pertinent part, as follows: "In the event that any engine not owned by Lessor shall be delivered with the returned Airframe (a 'Replacement Engine'), Lessee, concurrently with such delivery, will, at no cost to Lessor, furnish ... to Lessor a ... bill of sale with respect to each such engine ... and Lessor shall execute a bill of sale evidencing the transfer. Upon transfer of title to Lessor, such Replacement Engine shall be deemed to be an Engine for all purposes hereof and thereupon Lessor will transfer to Lessee ... all of Lessor's right, title, and interest in and to any engine not installed on such Airframe at the time of the return thereof." (*Id.* at 30–31.)

*Comment:* This provision sets forth the procedures applicable to the return by Northwest of an engine other than, and in place of, an original Engine. At the time of return, there must be a formal exchange of title documents, through which title to the substitute engine, now called a "Replacement Engine," is transferred to the Lessor and title to the original Engine, now reduced to the status of a mere engine, is simultaneously transferred to Northwest. At that point, such "Replacement Engine shall be deemed to be an Engine for all purposes hereof." (*Id.* at 31.) The question at the heart of this case is whether this means, among other things, that the parts (now indisputably Parts) of the Replacement Engine, having functionally replaced the corresponding Parts (now parts) of the original Engine (now an engine), constitute "replacement Parts" within the meaning of Section 7.2.2. If they do, then their value and utility must be equivalent to the value and utility of the corresponding Parts (now parts) of the original Engine (now an engine), measured as of the point at which title was exchanged.

Northwest's answer to this core question is that, while the Parts of the Replacement Engine may functionally have replaced the former Parts of the original Engine when the exchange occurred, such Parts nevertheless do not constitute "replacement Parts" within the meaning of Section 7.2.2, because a Section 7.2.2 replacement of Parts is not triggered by the wholesale swap of an engine for an Engine, but only by the physical removal of one or more Parts from an Engine due to their having become physically incapable of performing their intended functions or otherwise in the ordinary course of maintenance. Here, according to Northwest, the only physical removal of a part that occurred was the removal of the disks (before they became Parts) from the engines that Northwest owned outright (before they became Engines). Under this logic, Section 7.2.2 was never triggered; the Parts of the Replacement Engine therefore never became "replacement Parts" within the

meaning of Section 7.2.2, even though, at the moment of exchange, they functionally replaced each of the corresponding former Parts of the original Engine; and the Parts of the Replacement Engine therefore need not satisfy the equal value and utility standard of Section 7.2.2, relative to those corresponding former Parts of the original Engine. This is certainly one conceivable interpretation of certain isolated words and phrases found within Section 7.2.2. The question to be decided is whether that interpretation is sufficiently plausible to warrant summary judgment for Northwest or even to raise an issue of fact sufficient to defeat summary judgment in favor of plaintiffs, when those isolated words and phrases are read in context and an attempt is made to give meaning to the Lease as a whole.

Section 8.3, entitled "Condition of the Aircraft," provides, in pertinent part, that "[t]he Aircraft at the time of return to Lessor shall have been maintained and repaired in accordance with the Maintenance Program and this Lease." (*Id.*)

*Comment:* In broad outline, plaintiffs contend that there are two independent reasons why Northwest may not replace longer life disks with shorter life disks in engines slated to become Replacement Engines. First, as discussed, plaintiffs contend that this practice violates the requirement of Section 7.2.2 that Parts be replaced with Parts of equal value and utility. As to such argument, Northwest responds that (1) it may do anything it wishes with engines and parts before they become Engines and Parts, because engines and parts, as distinguished from Engines and Parts, are not subject to the Lease, and (2) Parts that functionally replace Parts as the result of the exchange of an engines for an Engine are not "replacement Parts." Second, as also discussed, plaintiffs contend that this practice constitutes a form of discriminatory maintenance, in violation of Section 7.2. Again, Northwest's response is that, since the Lease applies only to Engines, the mainte-

nance provisions of Section 7.2 (as distinguished from FAA regulations) do not at all restrict its right to maintain engines (as distinguished from Engines) any way it sees fit. The phrase "shall have been maintained" in Section 8.3 calls into serious question Northwest's argument insofar as it applies to the maintenance branch of plaintiffs' argument. The tense in which such phrase is written would appear to require that, at the time the Aircraft (which includes Engines and Replacement Engines) is returned, the parties make a retrospective determination as to how that Aircraft, including any Replacement Engines, was maintained. If Replacement Engines were not maintained "in accordance with the Maintenance Program and this Lease," then, as I read the phrase "shall have been maintained," there would be a breach of the Lease "at the time of return," even if the maintenance was done (or not done) at a time before the engines became Replacement Engines, or, in other words, before the "time of return." Of course, even if all that were true, it would still remain to be seen whether the replacement of long life disks with short life disks for the purpose of readying an engine for return to the Lessor is a form of "maintenance and repair" at all and, if it is, whether it is a form that violates the Maintenance Program or the Lease. For reasons discussed below, such issues become moot if the alternative interpretation of Section 7.2.2 first proposed at the October 1997 hearing is adopted.

Section 8.3 goes on to set forth at least one particular requirement that has a bearing on the parts replacement issue. Section 8.3.3, entitled "Deferred Maintenance," provides that Northwest "will not defer scheduled maintenance or service with respect to the Aircraft in contemplation of return of the Aircraft and will maintain the Aircraft in accordance with the Maintenance Program." (*Id.*)

*Comment:* Section 8.3 would appear to have one or both of two related purposes. The first purpose would be to assure that

the Aircraft, including Engines, is not physically damaged and thus rendered less valuable as a result of Northwest's decision to defer maintenance "in contemplation of return of the Aircraft;" the second is to assure that Northwest does not fail to replace worn out Parts, which failure, wholly apart from concerns about physical damage to the Aircraft, would deprive Lessors of the economic benefits conferred by Section 7.2.2. In either case, this is one of several provisions of the Lease that would be rendered essentially meaningless under Northwest's view that maintenance provisions have no application to engines, as distinguished from Engines, and that Section 7.2.2 has no application to Parts of Replacement Engines that functionally replace corresponding former Parts of original Engines. Specifically, the protection seemingly offered by Section 8.3.3 would become at best illusory and at worst a cruel hoax if Northwest could defer maintenance with respect to a shadow engine and then, at the time of Lease expiration, exchange the shadow engine, whose maintenance had been deferred and whose Parts had therefore deteriorated in value, for the perfectly-maintained original Engine, which original Engine (now an engine) would then become the property of Northwest.

Section 8.6, entitled "Engine Condition," provides, in pertinent part, that "[u]pon return of the Aircraft, the number of Hours and Cycles of operation remaining until the next scheduled engine removal, under the Maintenance Program, shall not be less than 2,000 remaining Hours and 2,000 remaining Cycles for any one Engine." (*Id.* at 32.) The section goes on to impose requirements for "across the Wing" averages for all three Engines. (*See id.*)

*Comment:* This is one of the sections on which Northwest relies most heavily. Northwest contends that Section 8.6 sets forth the *only* requirements regarding the number of Hours and Cycles that returned Engines must satisfy. Northwest further

contends that this specific provision does not conflict with any general provision of the Lease dealing with maintenance or Parts replacement, but that, even if it does, the specific must prevail over the general, pursuant to familiar principles of contract construction. Plaintiffs contend that this section merely establishes a floor below which the Hours and Cycles remaining on the returned Engines must not under any circumstances fall, but that it does not supercede any general provision dealing with maintenance or Parts replacement. Construed in this manner, there would be no conflict between Section 8.6 and any other provision of the Lease and no need to invoke the principle of contract construction on which Northwest relies as a fallback position. Section 8.6 does not, by its terms, favor one side's interpretation over the other. If Northwest's interpretation is correct, however, Northwest would be entitled to summary judgment on all issues, since it is undisputed that the Replacement Engines returned by Northwest did meet all the Hours and Cycles requirements set forth in this section.

Section 8.9, entitled "Inspection," provides, in pertinent part, that "[d]uring the last six months of the Term . . . Lessee will cooperate . . . with the efforts of Lessor to sell or lease the aircraft, including, without limitation, permitting prospective purchasers or lessees to inspect the Aircraft." (*Id.* at 33.)

*Comment:* This is another provision whose interpretation has no direct bearing on the outcome but which would be rendered essentially meaningless, as applied to Engines, if Northwest's interpretation of the Lease were correct. Under Northwest's interpretation, prospective purchasers or lessees would be permitted to inspect the Engines for the evident purpose of determining their condition and value, but the Lessor would be utterly incapable of giving assurances to the inspectors that the quality of the Engines they would be acquiring at the end of the Lease term, or of any of the Parts of such Engines, would

be comparable to the quality of the Engines and Parts they had inspected. The inspections would thus serve no conceivable purpose, and any benefit Section 8.9 seemingly conferred on the Lessor would be illusory.

Section 8.20, entitled "Configuration and Condition," provides, in pertinent part, that "[t]he Aircraft shall be returned in . . . the same condition with all Parts installed therein as on the Delivery Date, excepting only modifications, additions, replacements and substitution of Parts as may have been property made by Lessee pursuant hereto and as specifically otherwise set forth in Section 7 or or [sic] this Section 8." (*Id.* at 36.)

*Comment:* It is undisputed that the Parts installed on the Aircraft, at least to the extent the term "Aircraft" is defined to include Engines, are not the same Parts that were "installed therein as on the Delivery Date," at least to the extent that Parts include disks. It would appear, therefore, that Northwest is in breach of the Lease unless it can point to some provision within Section 7 or Section 8 that "specifically" permits it to return the Aircraft with non-original Engine Parts. Section 7.2.2 of course expressly permits Northwest to replace Parts, including Engine Parts, and it is therefore the first section that comes to mind as conceivably authorizing Northwest to return the Aircraft with non-original Engine Parts. But if Northwest were to invoke Section 7.2.2 here, it would be taking a fatal leap from the frying pan into the fire, because Parts replaced pursuant to Section 7.2.2 are unquestionably "replacement Parts" and must therefore be of equal value and utility to the Parts they replaced. This of course would completely undercut Northwest's position here. In the alternative, Northwest can attempt to argue that since Section 8.2 expressly permits it to return Replacement Engines in place of original Engines, then it must be implicit in Section 8.2 that it may return non-original Engine Parts. But Sec-

tion 8.20 permits only such Parts replacements as are "specifically . . . set forth in Section 7 or . . . Section 8," and there would appear to be no such *specific* authorization within Section 8.2 to return non-original Engine Parts. For that, Northwest might still have to rely on Section 7.2.2, which plaintiffs would argue was obviously drafted to serve just such purpose. Moreover, even if Section 8.2 were construed to confer specific authorization of the type that Section 8.20 expressly requires, the non-original Engine Parts comprising the Replacement Engine might still plausibly be characterized as "replacement Parts" within the meaning of Section 7.2.2, since Section 7.2.2 does not, by its terms, purport to restrict the term "replacement Parts" to parts replaced pursuant to Section 7.2.2. This interpretation, of course, would put Northwest right back into the fire.

Section 10, entitled "Loss, Destruction, Requisition, etc.," deals with certain circumstances that cause the Aircraft to become unuseable, including destruction, theft, condemnation, confiscation, official grounding, or requisition by the government. All such events are referred to generically as "Event[s] of Loss." Section 10.1, entitled "Event of Loss with Respect to the Aircraft," provides, in pertinent part, that "[u]pon the occurrence of an Event of Loss with respect to the Airframe or the Airframe and the Engines and/or engines then installed thereon . . . Lessee shall pay . . . to Lessor . . . the Stipulated Loss Value of the Aircraft . . . . [and that at] such time as Lessor shall have received [such] sum," Northwest's obligation to pay rent ceases, the Lease terminates, and the Lessor transfers title to the Airframe and the three Engines to Northwest. (*Id.* at 38–39.) The "Stipulated Loss Value" is defined as the original acquisition cost of the Airframe and Engines, discounted in accordance with a depreciation schedule attached to the Lease as Exhibit C. (*Id.* at 8.)

*Comment:* If any event causes the Airframe to become unuseable, the Lease immediately terminates and Northwest must involuntarily purchase both the Airframe and the Engines from the Lessor for a price based on their original acquisition cost. Significantly, where the Lease terminates under these circumstances, the purchase price does not vary depending on whether engines less valuable than Engines are installed on the Airframe at the time of Lease termination. Indeed. Northwest must purchase the original Engines for their then fair value, wherever they may be located at the time the Airframe becomes unuseable, and it must do so even if the Engines are completely unaffected by the Event of Loss. The value that the Lessor receives under these circumstances of an unscheduled termination and forced sale should be contrasted with the value that the Lessor receives under Northwest's interpretation of the Lease if the Lease runs its full term and Northwest returns the Airframe with engines other than the original Engines attached to it. Under those circumstances, if Northwest's interpretation is correct, the Lessor must be content with whatever the value is of the engines that Northwest unilaterally chooses to return, which may be substantially lower than the then fair value of the original Engines. Northwest suggests no explanation for this seemingly arbitrary disparity, in which the value that the Lessor receives can vary substantially depending on whether the Lease happens to expire at the end of its full term or, instead, terminates as little as a day earlier as the result of the fortuitous occurrence of an Event of Loss.

Section 10.2, entitled "Event of Loss with Respect to an Engine," provides, in pertinent part, that "[u]pon the occurrence of an Event of Loss with respect to an Engine under circumstances in which there has not occurred an Event of Loss with respect to the Airframe, Lessee shall . . . convey . . . to Lessor, as replacement for the Engine with respect to which such Event of Loss occurred, title to another engine of the same type as the Engine . . . and having a value and utility at least equal to, and being in as good operating condition as, the Engine with respect to which such Event of Loss occurred," at which point the Lessor will convey to Northwest the Engine as to which the Event of Loss occurred and such Engine will cease to be an Engine under the Lease. (*Id.* at 39–40.)

*Comment:* Here again, if an Engine becomes unuseable as the result of an Event of Loss, Northwest must replace such Engine with one having at least equal value and utility. Two related observations may be made concerning this provision. First, Northwest suggests no reason why the parties would have wanted to treat differently the voluntary exchange of a Replacement Engine for an original Engine at the end of the Lease term and the involuntary exchange of a Replacement Engine for an original Engine that suffered an Event of Loss during the Lease term. Second, if Northwest's interpretation is correct, then any benefit seemingly conferred upon the Lessor by this provision, like so many others, would be illusory. The Replacement Engine of equal value and utility that Section 10.2 requires Northwest to convey to the Lessor during the Lease term to replace the Engine that suffered the Event of Loss would ultimately become the property of Northwest at the end of the Lease term and be replaced by a different Replacement Engine that Northwest specially built with Parts of lesser value and utility.

Section 10.5, entitled "Requisition for Use of an Engine by the United States Government or the Government of Registry of the Aircraft," incorporates by reference the provisions of Section 10.2 in the event a governmental agency requisitions the use of an Engine, "to the same extent as if an Event of Loss had occurred with respect thereto." (*Id.* at 41.) Therefore, the comments concerning an Event of

Loss with respect to an Engine apply here as well.

Section 10.7, entitled "Repairable Damage; Use of Insurance Proceeds," concerns the situation in which insurance proceeds are paid to the Lessor in respect of the occurrence of either (1) repairable damages to an Aircraft or any of the Engines or (2) an Event of Loss with respect to an Engine that does not also involve an Event of Loss to the Airframe. (*Id.* at 42.) In the former case, the Lessor must pay the proceeds over to Northwest upon its "furnishing evidence . . . that such damage has been made good or repaired . . . such that the condition of the Aircraft shall be at least equivalent to its condition immediately prior to the event of damage." (*Id.*) In the latter case, the Lessor may itself "utilize the relevant insurance proceeds in the purchase of a Replacement Engine." (*Id.*)

*Comments:* For all the reasons previously given, the protection these provisions would seem to provide to the Lessor regarding the use of insurance proceeds to repair or replace damaged or unuseable Engines would be illusory under Northwest's interpretation of the Lease, because the Engines that had been restored to their original condition or replaced with Replacement Engines purchased by the Lessor would ultimately become the property of Northwest, while Replacement Engines of inferior value and utility would ultimately be returned to the Lessor at the end of the Lease term.

Section 15, entitled "Remedies," sets forth various remedies to the Lessor in the event of a default by Northwest. It provides, in pertinent part, that "[u]pon the occurrence of any Event of Default . . . Lessor may [*inter alia* ] . . . cause Lessee to return promptly . . . any Engine . . . in the manner and condition required by, and otherwise in accordance with all the provisions of, Section 8 as if such . . . Engine were being returned at the end of the Term." (*Id.* at 64.) In addition, the Lessor may "rescind" the Lease. (*Id.* at 65.)

*Comment:* This section incorporates, *inter alia*, the provisions of Section 8.2 concerning the return of Replacement Engines upon Lease expiration. To be consistent with its overall position regarding rights upon Lease expiration, Northwest must read this provision as permitting it to return upon the occurrence of an Event of Default a Replacement Engine of inferior value and utility, relative to the original Engine, notwithstanding that Section 10.1 requires it to purchase the original Engine for its then fair value upon the occurrence of an Event of Loss. In other words, under Northwest's interpretation, the Lease would treat it more favorably upon the occurrence of an Event of Default, for which it likely would have been responsible, than upon the occurrence of an Event of Loss, for which it likely would not have been responsible. Northwest offers no explanation for this seeming anomaly.

Section 22, entitled "Miscellaneous," provides, in pertinent part, that the Lease "shall in all respects be governed by and construed in accordance with, the laws of the State of Minnesota including all matters of construction, validity and performance." (*Id.* at 73.)

*Comment:* The parties agree that this provision is valid and enforceable in accordance with its terms.

### III. *SUMMARY AND RESTATEMENT OF PROPOSED INTERPRETATIONS*

At this point, to put the discussion that follows into sharper focus, it will be helpful to summarize and restate some possible interpretations of the operative provisions of the Lease.

Northwest contends that engines it owns outright are not subject to the Lease and, therefore, that it may remove and replace parts from such engines at will and without regard to the provisions of the Lease dealing with Parts replacement or mainte-

nance.[2] It further contends that it may use any such engine as a Replacement Engine to replace an original Engine at the end of the Lease term without having to comply with the Parts replacement provision, because complete Engines are not Parts and Parts of Replacement Engines are not "replacement Parts," even though they functionally replace the corresponding former Parts of the original Engine when title is exchanged. Putting all this together, Northwest contends that, as long as the Engines it returns meet the Hours and Cycle requirements of Section 8.6 of the Lease, there is nothing in the Lease that prevents it from removing disks from engines that it intends to return as Replacement Engines and replacing such disks with disks having a shorter useful life, and then using the specially rebuilt Replacement Engines to replace the original Engines. This is exactly what it did here, thus accomplishing indirectly what the Lease would clearly prohibit it from doing directly.

Plaintiffs' position appears to have evolved somewhat over the course of the litigation. Originally, as now, plaintiffs maintained that Northwest's practice of returning Engines that had been rebuilt with less valuable disks constituted both a form of prohibited maintenance discrimination and a form of prohibited Parts replacement. What has changed is the theory upon which plaintiffs base their contention that Northwest violated the Parts replacement provision of the Lease.

Plaintiffs' original theory was that the engines whose disks had been replaced became subject to the Lease, including the Parts replacement provision, as soon as they were "substituted" for Engines, and such substitution could occur as early as the time that Northwest subjectively knew they were to be used as replacements for the original Engines.[3] As their only the engine would have to have become an Engine by the time the disks were replaced. But the disks are replaced while the engine is still in the maintenance shop, before it has been attached to the Airframe. Therefore, for plaintiffs' original theory to be valid, support for this theory, plaintiffs relied on the definition of "Engine," which included "any engine which may from time to time be *substituted*, pursuant to the terms hereof, for any of such three [original Engines]." (*Id.* at 4 (emphasis added).) At the hearing on the parties' cross motions for summary judgment, I expressed considerable doubt about the validity of such theory. My first objection to it was and is that it ignores the phrase "pursuant to the terms hereof." Such phrase seems clearly to refer to and incorporate by reference the formal title and document exchange provisions of sections such as 8.2. Section 8.2 states, in pertinent part, that Northwest must give the Lessor a bill of sale with respect to any Replacement Engine, that the Lessor must give Northwest a bill of sale evidencing the transfer, and that, "[u]pon transfer of title to Lessor, such Replacement Engine shall be deemed to be an Engine for all purposes." (*Id.* at 30–31.) Even then, to complete the exchange, the Lessor must transfer to Northwest its entire interest in the replaced Engine (now an engine).

---

2. In this limited respect, Northwest is correct.

3. Plaintiffs at times suggest that an engine becomes an Engine at the point at which it is physically attached to an Airframe, but clearly the transformation would have to occur earlier for plaintiffs to prevail under the Parts replacement branch of their original theory. Under such original theory, there would be no violation of the Parts replacement provision unless the replaced disks had already become Parts by the time they were replaced. But parts do not become Parts unless the engine in which they are installed is an Engine. Therefore, for plaintiffs' original theory to be valid, the engine would have to have become an Engine by the time the disks were replaced. But the disks are replaced while the engine is still in the maintenance shop, *before* it has been attached to the frame. Therefore, for plaintiffs' original theory to be valid, the engine would have to have become an Engine while it was still in the maintenance shop, *before* it was attached to the Airframe.

None of these formalities would be required under plaintiffs' interpretation of the definition of "Engine," rendering the phrase "pursuant to the terms hereof" meaningless. My second objection to plaintiffs' interpretation is that it would blur the distinction between engines and Engines by making it difficult to pin down the point at which an engine was transformed into a Replacement Engine. Only by complying strictly with the bright line title exchange formalities of provisions such as Section 8.2 could the parties always be sure to know whether and when the transformation had occurred and which three Engines were subject to the Lease at any given time.

While disagreeing with plaintiffs' original interpretation of the Lease in this respect, I inquired at the hearing on the cross motions for summary judgment about a possible variation that would give meaning to the phrase "pursuant to the terms hereof" and preserve the bright line distinction between engines and Engines. The alternative interpretation was simply this: at the time an engine replaces an original Engine pursuant to Section 8.2, all Parts of such engine (now a Replacement Engine) become "replacement Parts" with respect to the original Engine (now an engine), within the meaning of Section 7.2.2. As such, all such replacement Parts (including, but not limited to, disks) must "be in as good operating condition as, and shall have a value and utility at least equal to" the corresponding Parts (now parts) of the replaced Engine (now an engine) as of

4. Of course, the disks in the Replacement Engine would still have to satisfy the minimum Hours and Cycle requirements of Section 8.6, just as the disks in the original Engine would have been required to satisfy such requirements, if the original Engine had not been replaced by the Replacement Engine.

5. Although Northwest clearly rejected the proposed alternative interpretation, it may have misunderstood it, as evidenced by Footnote 2 of its Supplemental Memorandum. Footnote 2 purported to demonstrate the "absurd consequences" to which the alternative explanation would lead, but it mistakenly as-

the instant of replacement. (*See id.* at 21.) Under such variation (and contrary to plaintiffs' original interpretation), the Lease would permit Northwest to remove longer-life disks from engines slated to become Replacement Engines and replace them with shorter-life disks, provided the value and utility of the replacement disks were at least equal to the value and utility of the disks in the original Engine as of the instant the engine whose disks had been replaced (now a Replacement Engine) replaced the original Engine (now an engine).[4] For that matter, if Northwest happened to have available within its fleet an engine whose existing disks (and other parts) were already of comparable value and utility to the disks (and other parts) of the original Engine, it could use such engine, as is, as a replacement for the original Engine, without having to replace any disks (or other parts) at all. In either case, the Lessor would be assured of getting back a Replacement Engine whose condition at least equaled the then existing condition of the original Engine that it was replacing. Contrary to plaintiffs' original interpretation, however, it would not prevent Northwest from building the engine that was slated to become the Replacement Engine down to such condition, if, before the build down, the disks of such engine were in a *better* condition than the disks in the original Engine that was to be replaced. This is the alternative interpretation that the parties were given time to consider and which, in their respective supplemental memoranda, Northwest rejected[5] and plaintiffs agreed to accept.

sumed that, under it, parts of an engine would become Parts under the Lease the moment the engine was installed on an Airframe. (Northwest's Supp.Mem. at 2 & n. 2, Docket No. 76.) In actuality engine Parts would not become Parts (or, therefore, replacement Parts) until the engine in which they were installed had become an Engine, which in turn would not occur until Northwest had conveyed to the Lessor title to such engine (now a Replacement Engine) and the Lessor had conveyed to Northwest title to the original Engine (now an engine). Typically, this would occur at the end of the Lease term, but

Since the summary judgment record does not indicate whether the Hours and Cycles remaining in the rebuilt engines at least matched the Hours and Cycles that were then remaining in the original Engines at the instant the rebuilt engines became Replacement Engines, it would not be possible to determine on the present record whether Northwest violated the Lease, if such interpretation were adopted.

Before I turn to the analysis that will determine whether any these interpretations, as a matter of law, is the correct one, I should note that plaintiffs have not formally abandoned their contention that Northwest violated the maintenance anti-discrimination provision of the Lease. Nevertheless, for the following reason, that issue would be rendered moot under the alternative interpretation.

The analysis begins with the premise that, even under an expansive reading, the anti-discrimination provision would not prevent Northwest from reattaching the original Engines to the Airframes preparatory to returning the Aircraft to the Lessor at the end of the Lease term, even if to do so would require Northwest to remove the engines that were then on the Airframe earlier than the Maintenance Plan would otherwise require. In other words, while the Lease *permits* Northwest to return engines other than the original Engines, it never *requires* that it do so; rather, Northwest always has the option under the Lease to return to the Lessor the original Engines in their then existing condition (assuming they have been maintained in accordance with Lease requirements). Based on that premise, which plaintiffs would not appear to dispute, there could be never be any damages if

it could also occur earlier pursuant to provisions such as Section 10.2, upon the occurrence of an Event of Loss with respect to an Engine. In either case, there would be no "absurd consequences" because, at any given time, three specific Engines and only those three specific Engines would be subject to the Lease.

Northwest returned, instead of the original Engines, rebuilt engines that were at least as valuable and useful, and this would be true even if, as a technical matter, the rebuilding of those engines down to the then existing condition of the original Engines is deemed to be a form of maintenance that Northwest would not ordinarily follow with respect to its own engines. In the absence of any damages, any potential claim for violation of the anti-discrimination provision would be moot. This is simply another way of saying that, under the alternative interpretation, the Lessor is entitled to get back the original Engines, maintained in accordance with the Lease, or their equivalents—nothing less, but nothing more either. In this respect, and consistent with the structure of the Lease overall, the alternative interpretation would put Engines on a par with Airframes, while making allowances for the fact that engines are routinely rotated from airframe to airframe, making it unduly burdensome and expensive to require that the original Engines be returned at the end of the Lease term.[6]

## IV. *DISCUSSION AND ANALYSIS*

### A. *The Summary Judgment Standard*

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Whether such dispute exists is determined with reference to governing substantive law. Where, as here, the parties have filed cross motions for summary judgment, the two motions must be considered independently, with all inferences drawn in favor of the party op-

6. Based on the premise that the alternative interpretation renders plaintiffs' arguments about the anti-discrimination provision moot, I shall give such arguments no further consideration. Those arguments will ultimately have to be considered, however, if the recommendation herein regarding the proper interpretation of the Parts replacement provision is rejected in favor of Northwest's interpretation.

posing the particular motion under consideration. *E.g., Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990); *Datatrend Inc. v. Jabil Circuit, Inc.,* 3 F.Supp.2d 66 (D.Mass.1998). Nevertheless, here, both sides have consistently and forcefully maintained through several rounds of pleadings that, notwithstanding their sharp disagreement about the meaning of the Lease, the dispute can and should be resolved on summary judgment. (*E.g.,* Northwest's Reply Memorandum and Opposition to Plaintiffs' Cross–Motion for Summary Judgment at 2 n. 1, Docket No. 65 ("Because both parties are in agreement that the lease interpretation issue may be decided on the basis of the contract language itself, and the background facts of record that are not genuinely contested, the Leases can and should be construed as a matter of law."); Plaintiffs' Reply to Northwest's Opposition to Plaintiffs' Cross–Motion for Summary Judgment at 1, Docket No. 68 ("The parties agree 'that there is no genuine issue of fact material to the interpretation of the Leases' and that the Leases can and should be construed by this Court as a matter of law.").) Under these circumstances, in deference to the strong interest both sides have expressed in having the Lease construed as a matter of law, the court should make every reasonable effort to interpret the Lease on the basis of the summary judgment record. Indeed, even in the absence of such urging by the parties, the law of Minnesota, as we are about to see, has given courts considerable latitude (and responsibility) to construe written agreements as a matter of law whenever possible, including under some circumstances where particular words or phrases material to the dispute are ambiguous.

### B. *Governing Principles of Contract Construction*

The parties contend, and I agree, that Minnesota law governs the interpretation

of the Lease.[7] *See Emery v. Merrimack Valley Wood Products,* 701 F.2d 985, 989 n. 4 (1st Cir.1983) ("In general, the parties' specification of the governing law in a contract will control, so long as the contract has a reasonable relation to the jurisdiction whose law is chosen.").

■ Under Minnesota law, a court called upon to construe a contract must attempt to give effect to the intention of the parties, as discerned from the language of the contract. *See Country Club Oil v. Lee,* 239 Minn. 148, 58 N.W.2d 247, 249 (1953). If the contract, taken as a whole and without consideration of extrinsic evidence, is reasonably susceptible of only one meaning, it is unambiguous and must be interpreted as a matter of law. *See Noreen v. Park Construction Co.,* 255 Minn. 187, 96 N.W.2d 33, 35 (1959). The question of whether a contract is ambiguous is also an issue of law. *E.g., Current Technology Concepts, Inc. v. Irie Enterprises,* 530 N.W.2d 539, 542 (1995); *Lamb Plumbing & Heating Co. v. Kraus–Anderson,* 296 N.W.2d 859, 862 (Minn. 1980). In deciding whether particular language is ambiguous, the court must give the words used by the parties their plain and ordinary meaning, in light of the apparent objective the parties were attempting to accomplish. *See Current Technology,* 530 N.W.2d at 542. Mindful, however, of the potential for uncertainty that is inherent in all language, the court must not give undue weight to the imprecision of any particular word, phrase, or sentence in an overzealous attempt to find ambiguity. To the contrary, if an isolated pocket of ambiguity exists, the court is required to seek meaning from context, through a process of synthesis rather than dissection. *See Hartung v. Billmeier,* 243 Minn. 148, 66 N.W.2d 784, 787–88 (1954) ("[I]t is not

---

7. Minnesota bears a reasonable relationship to the dispute because Northwest is a Minnesota corporation with a principal place of business in St. Paul, Minnesota. (*See* Third

Amended Complaint ¶ 3, Docket No. 44; Answer to Third Amended Complaint and Counterclaim ¶ 3, Docket No. 47.)

to be forgotten that any ... agreement is indefinite and uncertain in some degree since words are but imperfect symbols of what each party understands and intends. A proper administration of justice does not permit an overzealous quest for subtle ambiguity to destroy the intent of the parties when the court, despite some incompleteness and imperfection of expression, can reasonably find that intent by applying the words used, with all their reasonable implications, to the subject matter as the parties themselves, under all the surrounding circumstances, must have applied, used, and understood them."); *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 205 N.W.2d 121, 123 (1973) ("Read separately from the first sentence ... and out of context with the entire agreement, the second sentence could ... be ambiguous. Words, phrases, or sentences cannot be dissected and read in such isolation, however, for the determination that an agreement is ambiguous must be reached through a process of synthesis in which words, phrases, and sentences are assigned a meaning in accordance with the apparent purpose of the agreement as a whole."); *Country Club Oil*, 58 N.W.2d at 249 ("The intention of the parties must be gathered from the entire instrument and not from isolated clauses."). Above all, the court must attempt to interpret the contract in a sensible manner that harmonizes its provisions without rendering any of them meaningless, illusory, or nonsensical. *See, e.g., Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525–26 (Minn.1990) ("We construe a contract as a whole and attempt to harmonize all clauses of the contract.... Because of the presumption that the parties intended the language used to have effect, we will attempt to avoid an interpretation of the contract that would render a provision meaningless."); *Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 123 N.W.2d 793, 799–800 (1963) (interpretation of contract must "square[ ] with the cardinal rule of construction that any interpretation which would render a provision meaningless should be avoided on the assumption that the parties intended the language used by them to have some effect.... In searching for contractual intention, we must, of course, read the contract in its entirety ... to the end that the various provisions may be made to harmonize and unite in a consistent agreement in consonance with the intention of the parties"); *Employers Mutual Liab. Ins. Co. of Wisconsin v. Eagles Lodge*, 282 Minn. 477, 165 N.W.2d 554, 556 (1969) ("the terms of a contract must be read in the context of the entire contract, and the terms will not be so strictly construed as to lead to a harsh and absurd result"). Only if the language of a contract, taken as a whole and upon the application of the all the foregoing principles, is reasonably susceptible to more than one meaning may the court consider extrinsic evidence. *See, e.g., Donnay v. Boulware*, 275 Minn. 37, 144 N.W.2d 711, 716 (1966) (where contract language is ambiguous, court may "resort" to extrinsic evidence); *Noreen*, 96 N.W.2d at 35 (same). Even then, the interpretation of the contract still presents an issue of law if the extrinsic evidence is undisputed and supports only one reasonable interpretation. *See id.*, 96 N.W.2d at 35 (" 'if the [contract] language is ambiguous, resort may be had to extrinsic evidence, and construction then becomes a question of fact, unless such evidence is conclusive.... Where such extrinsic evidence is conclusive and undisputed and renders the meaning of the contract clear, its construction again becomes a question of law for the court' "), *quoting Leslie v. Minneapolis Teachers' Retirement Fund Assn.*, 218 Minn. 369, 16 N.W.2d 313, 315 (1944).

### C. The Interpretation of the Lease

Examined as a whole, the Lease cannot possibly mean what Northwest says it does. Such interpretation would (1) permit Northwest to do indirectly what the Lease indisputably prohibits it from doing directly; (2) render several major provi-

sions of the Lease meaningless, illusory, or downright absurd; (3) destroy the symmetry that pervades the Lease overall with respect to the treatment of Airframes and Engines, save for the need to accommodate the rotation of Engines through Northwest's fleet; and (4) conflict with the most plausible construction of the operative provisions of the Lease. I will consider each of these points separately, although each reinforces the others so that, taken together, they support a conclusion whose soundness exceeds the combined strength of the individual points on which it is based.

. Concerning the first point, Section 7.2.2 permits Northwest under certain circumstances (and requires it under others) to replace Parts. It goes on to state flatly and without exception, however, that the "replacement Parts ... shall be in as good operating condition as, and shall have a value and utility at least equal to, the Parts replaced." (Lease at 21, Docket No. 78.) Disks in Engines indisputably are Parts. There can be no question, therefore, that Section 7.2.2 would prohibit Northwest from removing disks from an original Engine, replacing those disks with ones of lower Hours and Cycles, and returning the original Engine with the inferior disks, and that this would be true even if the Hours and Cycles remaining in the replacement disks were sufficient to meet the specific requirements set forth in Section 8.6.[8] Northwest would argue, however, that it can take an engine that is a clone of the original Engine in all respects, remove disks from such engine and replace them with disks having fewer Hours and Cycles remaining, and return that engine to the Lessor as a Replacement Engine in lieu of the original Engine. To appreciate the absurdity of this result, one need only imagine the Engine and its identical twin sitting side by side in Northwest's maintenance shop on the eve of Lease expiration. Northwest contends it would be perfectly within its rights to remove and replace disks from the engine, and use it as a Replacement Engine, but that the Lease would prohibit it from performing identical surgery on the original Engine, even though the result would be precisely the same. I can think of no reason, and Northwest has suggested none, why the parties would have intended to prohibit Northwest from returning the original Engine with replaced disks but not an otherwise identical Replacement Engine.[9]

Northwest's interpretation not only would allow it to do indirectly what the Lease prohibits it from doing directly, but it would also render meaningless, illusory, or absurd many other provisions of the Lease that were obviously written for the benefit of the Lessor. There is no need to dwell on this point, because it has already been addressed in the context of the earlier discussion of specific Lease terms. Suffice it to say that, under Northwest's interpretation, provisions dealing with such diverse matters as the replacement of destroyed or requisitioned Airframes and Engines, the deferral of maintenance, limits on the removal and retention of obsolete parts, the conducting of inspections by prospective purchasers or lessors of Engines, and the quality standards applicable to replacement Parts all would be

8. In this respect, at least, Northwest is simply mistaken in its belief that the specific language of Section 8.6 conflicts with and, therefore, overrides the more general language of Section 7.2.2.

9. Similarly, suppose Northwest had in its maintenance shop on the eve of Lease expiration an original Engine with X Hours and Cycles remaining in its disks and an otherwise identical engine with .5X Hours and Cycles remaining. Northwest would be permitted under its interpretation to make an outright substitution of the engine with .5X Hours and Cycles remaining for the original Engine (assuming it otherwise met the requirements of Section 8.6), but it would be prohibited from simply transferring the disks from that engine into the otherwise identical original Engine. Again, it is difficult to conceive of any reason the parties might have had to make such a seemingly arbitrary and irrational distinction.

rendered meaningless or illusory. At the same time, other provisions, such as the relatively favorable treatment that would be afforded to Northwest upon the occurrence of an Event of Default, could not rationally be reconciled with other provisions, such as the relatively unfavorable treatment that would be afforded to Northwest upon the occurrence of an Event of Loss. Northwest's only response is to say, in effect, that this argument is a red herring, because most of the situations such provisions were intended to deal with, such as Events of Loss or Events of Default, did not arise, and, with the exception of attempting to downgrade engine disks in circumvention of Section 7.2.2, Northwest did not even attempt to exploit any that did. Such response is a *non sequitur*. The issue is not whether Northwest took full advantage of all the opportunities its interpretation would afford, but whether it is likely, or even conceivable, that the parties intended to draft the Lease in such a manner that would have permitted it to do so, had it been so inclined and had the opportunities presented themselves.

Third, the symmetry between the way the parties intended to treat Airframes and the way they intended to treat Engines is readily apparent throughout the Lease. Sometimes symmetry was achieved through the use of the defined term "Aircraft," which includes both the Airframe and the Engines. (*See, e.g.,* Lease at Sections 2.1, 4.8, 4.11, 7.2(A)(1), 7.3, 8.1, 8.3, and 8.20, Docket No. 78.) Other times, it was achieved through the reference within a single provision to both the Airframe and the Engines. (*See, e.g., id.* at Sections 7.2.2, 7.2.3, 7.2.4, 7.4, and 8.26). On yet other occasions it was achieved through the use of separate, parallel provisions dealing with the Airframe and the Engines. (*See, e.g., id.* at Sections 10.1 and 10.2.) It is true, of course, that the symmetry is not perfect. Most notably, the Lease permits Northwest to return engines other than the original Engines but not an airframe other than the

original Airframe. But this rare exception to the symmetry that the parties otherwise so plainly sought to achieve is to accommodate Northwest's need to rotate engines from airframe to airframe and its desire to avoid the burden of having to reattach the original Engines to the Airframe at the end of the Lease term. These objectives are fully satisfied through the invention of the concept of a "Replacement Engine" and the exclusion of complete Engines from the definition of "Parts." They do not require that the quality of the returned Airframe and the returned Engines be measured by differing standards or make it any less suspect when quality assurance provisions that seemingly apply to both are rendered wholly illusory as to Engines.

Finally, there is an interpretation of Sections 7.2.2 ("Replacement of Parts"), 8.2 ("Return of Other Engines"), and 8.20 ("Configuration and Condition") which, in context, is far more plausible than Northwest's and would avoid all the foregoing problems. The analysis begins with the last of these three provisions. Section 8.20 requires that the "Aircraft ... be returned ... with all Parts installed therein as on the Delivery Date, excepting only ... replacements ... of Parts as may have been properly made by Lessee pursuant hereto and as specifically otherwise set forth in Section 7 or or [sic] this Section 8." (*Id.* at 36.) In other words, Northwest is in breach of the Lease if it returns Engines (which are incorporated into the definition of "Aircraft") containing non-original Parts, unless some provision within Sections 7 or 8 "specifically" authorizes it to do so.

As previously noted, Section 7.2.2 explicitly addresses the replacement of Parts. In its first sentence, it mandates that Northwest replace any Parts that "become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever." (*Id.* at 21.) In its second sentence, it permits Northwest to

"remove in the ordinary course of maintenance, service, repair, overhaul or testing, any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, provided that Lessee ... will at its own cost and expense replace such Parts as promptly as practicable." (*Id.*) It then goes on to provide in its third sentence that all "replacement Parts" must be "in as good operating condition as, and shall have a value and utility at least equal to, the Parts replaced." (*Id.*) Once replacement occurs, the "replacement Part" immediately becomes "subject to this Lease ... for all purposes." (*Id.* at 22.) The term "replacement Parts," unlike the term "Replacement Engine," is not defined. Applying the rule of construction that words in a contract shall be given their plain and ordinary meaning, it would seem that a "replacement Part" is any Part that assumes the former function of another Part. RANDOM HOUSE UNABRIDGED DICTIONARY 1633 (2d ed.1993) ("replace" defined as: "1. to assume the former role, position, or function of; substitute for ..."). In this sense, all the Parts of a Replacement Engine would clearly appear to be "replacement Parts," since they certainly assume the former functions of the corresponding Parts of the original Engine. If that were true, there would be no question that all the Parts of the Replacement Engine, including disks, would have to "have a value and utility at least equal to" the value and utility of the corresponding former Parts of the original Engine. This is the basis for the alternative interpretation that plaintiffs have expressed a willingness to accept.

Northwest takes issue with this analysis. Dissecting Section 7.2.2 and focusing on isolated words and phrases it pulls from it, Northwest argues that the former Parts of the original Engine that were replaced by the Parts of the Replacement Engine were neither "worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever" nor "remove[d] in the ordinary course of maintenance, service, repair, overhaul or testing." Therefore, according to Northwest, even if the Parts of the Replacement Engine did assume the former functions of the corresponding Parts of the original Engine (as they surely did), the Parts of the Replacement Engine are not "replacement Parts" within the meaning of Section 7.2.2 and are not subject to the equal value and utility standard applicable to "replacement Parts."

It is apparent from the context of both Section 7.2.2 itself and the Lease as a whole that Northwest's focus of isolated words and phrases within Section 7.2.2 has impaired its ability to see the forest for the trees. Unquestionably, the Parts of the original Engine became the property of Northwest the moment the Replacement Engine became an "Engine for all purposes." At that same moment, title to the Parts having passed from the Lessor to Northwest, those former Parts, including the disks of the original Engine, were "permanently rendered unfit for use" by Lessor, within the meaning of the first sentence of Section 7.2.2. This indeed would trigger the mandatory Parts replacement obligation of Section 7.2.2, which in turn would unquestionably make all the component Parts of the Replacement Engine "replacement Parts" subject to Section 7.2.2's equal value and utility requirement.[10]

10. This interpretation would not do violence to the exclusion of complete Engines from the definition of "Parts." Consistent with the purpose of such exclusion, it would fully preserve Northwest's right to remove an original Engine from an Airframe during the term of the Lease without immediately having to transfer to the Lessor title to the substitute engine or its component parts. The difference in result would be due to the fact that title to the original Engine and all its Parts would remain in the Lessor despite such mid-term substitution by Northwest of an engine for such original Engine, but title to the original Engine and all its Parts would be permanently transferred to Northwest upon the re-

Northwest might object to this interpretation on the ground that the phrase "unfit for use for any reason whatsoever" refers to some physical limitation inherent in the Part itself that renders it unfit for use by anyone for its intended purpose, rather than to a divestiture of title or other similar status change that merely removes it from the Lessor's legal or physical control. Context, however, proves Northwest wrong. The general phrase "or permanently rendered unfit for use for any reason whatsoever" is preceded by seven terms that describe specific types of circumstances that trigger a Parts replacement obligation. Only three of those terms—"worn out," "destroyed," and "damaged beyond repair"—involve situations in which a "replacement Part" replaces a Part that suffers from an inherent physical limitation that makes it "unfit for use" by anyone. The other four terms— "lost," "stolen," "seized," and "confiscated"—all describe situations in which replacement is required despite the fact that the Part to be replaced remains perfectly capable from a physical standpoint of performing as it was intended. Indeed, the words "seized" and "confiscated" in particular quite clearly refer to situations in which a Part must be replaced by Northwest not because of any inherent physical limitation in the Part itself, but because possession or title to such Part was transferred to another person. This is closely analogous to the situation here, the only difference being that the transfer of title here was initiated voluntarily by Northwest rather than involuntarily as the result of action or demand by the seizing or confiscating entity. Therefore, in context, the most plausible construction of the first sentence of Section 7.2.2 is that it encompasses situations in which Northwest, acting in a role analogous to that of the confiscating entity, chooses to retain the original Engine and return a Replacement Engine in its place. The passage of title

that invariably accompanies such exchange renders the former Parts of the original Engine "permanently . . . unfit for use" by Lessor, just as a seizure or confiscation of such Parts by a third party would have done. It follows that the Parts of the Replacement Engine constitute "replacement Parts" whose value and utility at the moment of replacement must equal the value and utility of the corresponding former Parts of the original Engine they replaced.

This conclusion is buttressed by the fact that Section 8.20 makes it incumbent on Northwest to identify *some* provision that specifically permitted it to return non-original Engine Parts. If, as Northwest maintains, Section 7.2.2 does not apply to the return of non-original Engine Parts, on what provision does it purport to rely to satisfy the requirement of Section 8.20? The only other candidate is Section 8.2, which permits the return of Replacement Engines, but Section 8.2 does not "specifically" authorize the return of non-original Parts. As for the argument that such authorization must be read into Section 8.2 by necessary implication, there are three responses. First, implication, no matter how necessary, does not satisfy the requirement of Section 8.20 that the provision relied upon "specifically" authorize the replacement of Parts under consideration. Second, it is difficult to see how such implication could be *necessary*, where, as just demonstrated, Section 7.2.2 by its terms quite nicely covers the swapping of complete engines for Engines pursuant to Section 8.2. Finally, even if the Engine Parts were replaced pursuant to implied authorization conferred under Section 8.2, they would still seem to qualify as "replacement Parts" within the meaning of Section 7.2.2. After all, Section 7.2.2 does not by its terms restrict the applicability of the term "replacement Parts" to Parts replaced pursuant to the authority of Section

turn of a Replacement Engine at the end of the Lease term. Only when title is actually transferred from the Lessor to Northwest are

the former Parts of the original Engine rendered "permanently . . . unfit for use for any reason whatsoever."

7.2.2. Instead, it refers to "replacement Parts" generally. If Northwest chooses *not* to read the first two sentences of Section 7.2.2 (and particularly the broad phrase "rendered unfit for any reason whatsoever") as encompassing every conceivable circumstance under which the Lease might require or permit Northwest to replace a Part, the generic phrase "replacement Parts" can certainly be read to encompass all the other circumstances under which the Lease requires or permits the use of "replacement Parts," including, if necessary, the use of replacement Engine Parts pursuant to authorization implicit in Section 8.2.

Taking all the foregoing factors into account, I conclude that the Lease unambiguously deems Parts of the Replacement Engine, including disks, to be "replacement Parts," within the meaning of Section 7.2.2. As such, replacement disks must be equal in value and utility to the corresponding former disks of the original Engine as of the time such former disks become unfit for use by the Lessor, or, in other words, as of the moment the Lessor transfers title to the original Engine and all its Parts to Northwest as a result of Northwest's decision to retain the original Engine.

Before I consider the implications of this conclusion for the specific counts of the Third Amended Complaint, I will address very briefly some of the more significant arguments Northwest makes against the foregoing interpretation.

1. Northwest points out that in April 1989, some eight months before it entered into the Leases involved in this case, it leased two other Boeing 727 aircraft from the same Lessors. The April lease expressly required Replacement Engines to have "a time status, modification status, value, condition and utility at least equal to the Engine it is replacing." (Northwest's Mem. in Support at 15, Docket No. 54.) During the negotiation of the Leases involved here, Northwest prepared a draft that deleted this express requirement.

There was apparently no discussion of the fact that such express requirement had been deleted or of the reason for or the effect of the deletion. Northwest now argues that the fact that the April lease had an express provision which required comparability of the time status, value, and utility of Replacement Engines and the Engines they replaced and that such provision was deleted from the Leases here establishes (or at least constitutes evidence) that the parties to the Leases involved here did not intend to require comparability between individual Parts of Replacement Engines and the corresponding former Parts of the Engines they replaced.

For three reasons, I do not find this argument persuasive. First, as both parties observe, the law of Minnesota is clear that where, as here, a contract taken as a whole is unambiguous, the court may not consider extrinsic evidence, not even for the limited purpose of determining whether an ambiguity exists. *See Instrumentation Services, Inc. v. General Resource Corp.*, 283 N.W.2d 902, 908 (Minn. 1979) ("Extrinsic evidence ... cannot be used to create ambiguity in a document."). Second, as Northwest states in its Memorandum in Support of Its Motion for Summary Judgment, under Minnesota law " 'the unexpressed intent of the parties' cannot alter the language of an agreement." (Northwest's Mem. in Supp. at 23, Docket No. 54, *quoting Metropolitan Sports Facilities Com'n v. General Mills, Inc.*, 470 N.W.2d 118, 123 (Minn.1991).) *See also Fena v. Wickstrom*, 348 N.W.2d 389, 390 (Minn.Ct.App.1984) ("The language the parties deleted from the exculpatory clause cannot be considered ... because the intent of the parties becomes relevant only when the contract language is ambiguous."). Third, even if I were to consider Northwest's proffered extrinsic evidence regarding the deletion of this provision from the April lease, I would not find it to be persuasive. The deletion of the express requirement that Replacement

Engines be of equal time status, value, and utility as the Engines they replaced is equally consistent with two hypotheses: first, that the parties intended to make a substantive change, and, second, that they realized that the express provision dealing with the comparability of complete Engines was superfluous (as I have concluded it was) in light of the provision dealing with the comparability of replacement Parts of Engines. Indeed, in this case, where it is undisputed that there was no discussion or meeting of the minds concerning the significance of the deletion, it is perfectly possible that Northwest intended to make a substantive change while the Lessor, if it was aware of the deletion at all, simply deemed it to be of an unnecessary provision, whose absence would not affect the substance of the Leases in any way. Under these circumstances, even if Minnesota law permitted extrinsic evidence to be considered, the evidence proffered by Northwest would be immaterial, because it would shed no light on the mutual or the reasonable intentions of the parties.

2. Northwest argues that it is a common practice within the aircraft leasing industry for lessees to search their fleets for return engines that come as close to the minimum return conditions as possible, without falling short of them. Plaintiffs concur that such practice exists and is not considered objectionable. Such practice would not be permissible under the Leases involved here, as I have interpreted them, if the Parts of the returned Engines were inferior to the corresponding former Parts of the retained Engines.

For two reasons I do not find this proffered evidence persuasive. First, as stated above, under Minnesota law, the court may not consider extrinsic evidence or use the unexpressed intent of the parties to alter the language of a contract if the contract, taken as a whole, is unambiguous. *See Metropolitan Sports*, 470 N.W.2d at 123. Nor may it consider extrinsic evidence to create an ambiguity in a contract which, taken as a whole, is unambiguous. *See Instrumentation Services*, 283 N.W.2d at 908. Second, neither side has presented evidence regarding the terms of the leases involved in those instances where this practice was followed; nor has either party discussed the comparability of those leases to the ones involved here. Those other leases may have been substantively different, or, unlike the Leases involved here, they may have been ambiguous. Without evidence linking those other leases to the ones involved here, evidence of a practice based upon them is immaterial.[11]

3. Northwest contends that the exclusion of complete Engines from the definition of "Parts" is further proof that the parties intended to permit Northwest to return Replacement Engines without regard to the Parts comparability requirement of Section 7.2.2. I have already noted that there is an alternative explanation for the exclusion of complete Engines from the definition of Parts. I further note that extrinsic evidence, if it were relevant, demonstrates that the exclusion of complete Engines from the definition of Parts could not have been for the purpose of permitting Northwest to return Engines with inferior Parts. Engines were excluded from the definition of Parts even under the April 1989 lease, (Lease Agreement dated as of April 11, 1989 at 5, attached as Ex. 5 to Appendix of Materials in Support of Northwest's Motion for Summary Judgment, Docket No. 57), which, as Northwest itself points out, expressly required Replacement Engines to be of equal time status, value, and utility as the Engines they replaced. I therefore discount any

11. In fact, Northwest has itself expressly characterized this specific trade practice as "[n]ot material," (Northwest's Response to Plaintiffs' Local Rule 56.1 Statement ¶ 13, Docket No. 66; *see* Plaintiffs' Local Rule 56.1 Statement ¶ 13, Docket No. 64), and has argued that leases vary so much from one to another with respect to return obligations that trade practices cannot take precedence over the plain language of the Lease itself. (*See* Northwest's Mem. in Supp. at 24, Docket No. 54).

supposed connection between the exclusion of complete Engines from the definition of Parts in the Leases involved here and the supposed intention of the parties to permit Northwest here, unlike under the April lease, to return Replacement Engines whose Parts were inferior to the Parts of the Engines they were replacing.

4. Northwest contends that the Lessor would receive a windfall if the value and utility of Parts of Replacement Engines had to be comparable to the former Parts of the Engines that Northwest chose to retain. For reasons already stated, this interpretation would confer no more a "windfall" on the Lessor than Section 7.2.2 indisputably does with respect to countless other Parts of the Airframe, from seat fabric, to tires, to light bulbs, to other more exotic Parts. What it would do is put Engines on a par with Airframes and give meaning to the many significant provisions of the Lease that would be rendered illusory under Northwest's interpretation.[12]

### D. *Significance of the Proposed Interpretation*

The summary judgment record does not reveal whether the value and utility of the disks of the Replacement Engines were comparable to the value and utility of the disks of the original Engines retained by Northwest, as of the time the Lessor transferred title to the original Engines to Northwest. Therefore, even if the Lease is interpreted to require comparability between the value and utility of the Parts of the Replacement Engine and of the corresponding former Parts of the Engines retained by Northwest, it would be premature to grant either side summary judgment as to liability on the breach of contract counts (Counts I, II, and III) of the Third Amended Complaint.

Count IV of the Third Amended Complaint seeks a declaration of the rights of the parties. At the time it was filed, plaintiffs interpreted the Lease to prohibit Northwest from downgrading disks of engines that had not yet become Replacement Engines. Under the alternative interpretation that plaintiffs have since agreed to accept and that I am recommending, Northwest may do so, and it may then use such engines as Replacement Engines, provided the downgraded disks of the Replacement Engine are at least comparable in value and utility to the disks of the original Engines as of the time the Lessor transferred title to the original Engines to Northwest. Construing Count IV as seeking a declaration consistent with this alternative interpretation, I recommend that summary judgment be granted to plaintiffs on the issue of interpretation.

Counts V, VI, and VII, respectively, assert claims for breach of Chapter 93A, breach of the implied covenant of good faith and fair dealing, and conversion, respectively. Northwest seeks summary judgment on these counts solely on the ground that it did not violate the Lease. (Northwest's Mem. In Supp. at 24–26, Docket No. 54.) Although there well may be other grounds on which Northwest is entitled to summary judgment on these claims even if Northwest did violate the Lease as I have interpreted it, it is not entitled to summary judgment based on the only developed argument it has presented. Therefore, I recommend that summary judgment be denied to Northwest on these counts, without prejudice to its right to argue that there are other grounds on which these claims must be rejected as a matter of law.

Plaintiffs' cross motion for summary judgment on Counts V, VI, and VII should also be denied, not just because it is pre-

---

12. The fact that disks may have to be replaced 2 or 3 times over the term of the lease does not distinguish disks from other Parts and does not affect the analysis. No matter how many times disks are replaced over the course of the Lease term, under Section 7.2.2, (a) Northwest must replace them each time they wear out, and (b) the Lessor gets the benefit of whatever life remains in the replacement disks when the Lease ends.

mature to say that Northwest violated the Lease as I propose that it be interpreted, but because plaintiffs have not shown affirmatively that they would be entitled to summary judgment even if it did. All plaintiffs have demonstrated, at most, is that Northwest is not entitled to summary judgment on such claims. It simply does not follow from the fact that Northwest is not entitled to summary judgment that plaintiffs are. *See Lopez v. Corporacion Azucarera de Puerto Rico,* 938 F.2d 1510, 1517 (1st Cir.1991) ("[B]efore granting [even] an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment ·as a matter of law") (citation omitted); *Mendez v. Banco Popular de Puerto Rico,* 900 F.2d 4, 7 (1st Cir.1990) (similar); *Jaroma v. Massey,* 873 F.2d 17, 20 (1st Cir.1989) (similar).

## V. *SUMMARY AND RECOMMENDATION*

For all the foregoing reasons, I recommend that summary judgment be granted to plaintiffs on Count IV of the Third Amended Complaint, construing such Count as seeking a declaration that, under the Leases, the value and utility of the Parts of the Replacement Engines returned by Northwest had to be comparable to the value and utility of the corresponding former Parts of the original Engines retained by Northwest, as of the time the Lessors transferred title to those original Engines to Northwest. In all other respects, I recommend that the parties' cross motions for partial summary judgment, (Docket Nos. 52 and 60), be **DENIED.**

## VI. *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 471–472, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).